## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CR-23-119-RAW** |
| | ) | |
| **BYRON KEITH SPENCER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Defendant Byron Keith Spencer was charged by way of indictment with one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). Defendant moved to suppress all evidence obtained pursuant to a traffic stop and subsequent automobile search, and the Court referred the Defendant's motion for findings and recommendation pursuant to 28 U.S.C. § 636(b)(1). *See* Docket No. 42. The undersigned Magistrate Judge initially granted part of Defendant's Opposed Motion to Suppress Evidence and Request for Hearing [Docket No. 40], by setting it for evidentiary hearing, which was conducted on Friday, February 23, 2024. *See* Docket Nos. 43, 47, 54. Following the suppression hearing, Defendant submitted supplemental briefing for the Court on Tuesday, March 5, 2024. *See* Docket No. 58. For the reasons set forth below, the undersigned Magistrate Judge now recommends that the remaining portion of Defendant's Opposed Motion to Suppress Evidence and Request for Hearing [Docket No. 40] be DENIED.

## Factual Summary

This case began on May 9, 2023, when City of Wewoka police Major Derek Vigil was on shift and observed the Defendant driving in Wewoka, Oklahoma. Major Vigil recognized Defendant driving by, having arrested him on previous occasions. Additionally, Major Vigil testified at the suppression hearing that he knew Defendant had a suspended license and that he had served search warrants at more than one of his residences, and that firearms had previously been recovered as a result. Upon observing Defendant, Major Vigil began to follow him while checking to confirm Defendant's license was still suspended. Upon confirmation that Defendant's license was still suspended, Major Vigil initiated his traffic lights for a traffic stop of Defendant's vehicle. Defendant did not immediately pull over, and Major Vigil testified that he observed Defendant's silhouette through the rear window of his truck, moving about and leaning toward the middle console such that the truck swerved once. Once Defendant stopped his vehicle, Major Vigil exited his vehicle and approached the driver's side of the vehicle where Defendant was seated. Major Vigil described Defendant's posture as "slumped," and possibly that he had been reaching for something. Upon approaching and observing Defendant, Major Vigil drew his weapon and began issuing commands for Defendant to comply, and Defendant exited the vehicle. As he was exiting, Major Vigil testified that he observed an open can of Mike's Hard Lemonade in Defendant's lap and asked him to place it on the floorboard of the driver's side of the vehicle. At that time, Major Vigil informed Defendant he was being placed under arrest for driving with a suspended license.

2

Major Vigil testified that, upon placing Defendant under arrest, he also conducted a pat-down of Defendant, during which he located a glass smoking pipe. The Government's brief indicates he found both a pocketknife and the pipe. *See* Docket No. 46, p. 2. While no dash cam or body cam footage of this was submitted to the Court and Officer Ernest Sego, who was equipped with a body cam, arrived after this pat down occurred, *see* Govt. Hr'g Ex. 4, Video 1 at 10:14:41,[1] Defendant concedes that Officer Sego's body cam shows a couple of items on top of Major Vigil's vehicle and that they appear to be a glass pipe and pocketknife. *See* Docket No. 40, p. 3.

Officer Sego arrived at the scene after the initial pat down. He placed Defendant in handcuffs and ultimately placed Defendant in the back of his truck due to the heat of the day. Before placing Defendant in his vehicle, Officer Sego asked Major Vigil if he had conducted a pat-down of Defendant. The audio of the conversation is not entirely clear, but Officer Sego appears to ask Major Vigil, "You searched him yet?" Major Vigil's response is largely inaudible, but it appears Major Vigil made no mention of a pocketknife or pipe to Officer Sego in this exchange. Furthermore, Major Vigil's Incident Report, *see* Dfdt. Hr'g Ex. C, contained no narrative description of the events of the arrest or in what order they unfolded. Gov't Hr'g Ex. 4, Video 2 at 10:20:21. After that conversation, Officer Sego conducted his own pat down, and did not appear to find additional items.

Major Vigil testified that, prior to Officer Sego arriving, he asked Defendant if there was anything illegal in the vehicle, and Defendant's response indicated that there was, but

---

[1] Times reflect the timestamp located in the lower right-hand corner of each video.

that it was not his.  Shortly after this exchange, Officer Sego arrived and Major Vigil moved Defendant to the back of the vehicle, where Officer Sego handcuffed Defendant and appeared to stay close to manage him.  Major Vigil testified that he *then* returned to the vehicle to retrieve the can of Mike's Hard Lemonade from the floorboard of the driver's side and that, as he reached to retrieve the can, he observed a handgun between the right side of the driver's seat and the middle console.  Major Vigil described himself as bending or almost kneeling down to reach for the can and stated that he used only vision to observe the handgun.  Notably, he testified that he removed the can and the handgun at the same time.  Additionally, he testified he observed a bag of a substance that appeared to be marijuana on the passenger side of the vehicle and a half empty bottle of what appeared to be Crown Royal.

Body cam footage from Officer Sego reflects some differences with Major Vigil's timeline of events.  The footage begins with Major Vigil and Defendant standing at the back of Defendant's truck and Officer Sego standing close to them, with a can already on the ground.  *See* Govt. Hr'g Ex. 4, Video 1 at 10:14:29.  Officer Sego then proceeds to handcuff Defendant while Major Vigil is moving around Defendant's truck.  Around 10:15:37, Major Vigil can he heard saying, "Whatcha got in this bottle?" and then retrieving what appears to be a bottle of liquor and placing it on the rail of the truck bed. At 10:16:11, Major Vigil can be observed using both hands to move the driver's seat forward.  *Id.*  Major Vigil then retrieves an unidentified item, possibly the marijuana, and Defendant can be heard saying something about finding it out in a field that day.  Major

Vigil continues to stand at the driver's side, looking and reaching into various areas. He then asks Defendant about a card, and Defendant responds, saying, "My tribal card?" Officer Sego answers, "No, your marijuana card. Medical card." *Id.* at 10:17:11. There is no further discussion at that time, and Major Vigil continues searching the vehicle. Officer Sego then moves Defendant further away from his truck and to the front of Major Vigil's vehicle. When Officer Sego turns back toward Defendant's truck, his body cam captures Major Vigil with a handgun in his hand and walking it toward his vehicle to collect. *Id.* at 10:17:32. Defendant does not dispute that those items were retrieved from his vehicle, but disputes Major Vigil's testimony as to when different items were retrieved. Specifically, the undersigned Magistrate Judge agrees with Defendant that, based on Officer Sego's body cam footage, Major Vigil did not see and retrieve the handgun when he removed the can from the truck as the can is observed outside the vehicle and on the ground almost three minutes prior to the discovery of the handgun.

Once Defendant was placed in Officer Sego's truck, Officer Sego read Defendant his *Miranda* rights. *See* Govt. Hr'g Ex. 4, Video 2, at 10:22:35. Officer Sego eventually took Defendant to the City of Wewoka police department, where he and Major Vigil were joined by District 22 Task Force Officer Chris Perteet, who questioned Defendant about the gun and drugs. Defendant made incriminating statements during questioning.

At the hearing, Major Vigil testified that he was cross-deputized with the Seminole Nation as of the time of the stop. Additionally, Seminole Nation Deputy Attorney General Victoria Holland testified at the hearing as to the relevant Deputation Agreement at issue

5

in this case.

## Analysis

Defendant contends that both his arrest and the search of his vehicle violated the Fourth Amendment because the officers had not been cross-deputized and therefore lacked jurisdiction over him. He therefore seeks to suppress: (i) statements made following his arrest and (ii) all evidence seized from the search of his truck. Alternatively, Defendant contends that Major Vigil's search of the truck exceeded the permissible scope and was therefore not a valid search incident to arrest.

### I.    Jurisdiction

It is undisputed that Defendant is charged with a crime committed in Indian Country, within the Seminole Nation, and that he is a registered member of the Muscogee (Creek) Nation [Dfdt. Hr'g Ex. E]. Additionally, it is undisputed that the City of Wewoka, specifically the place where Major Vigil stopped Defendant, is located within the boundaries of the Seminole nation. The Government contends Major Vigil had jurisdiction over Defendant because he was considered cross-deputized pursuant to a "blanket" cross-deputization agreement among the Seminole Nation, the City of Wewoka, Seminole County, and the 22nd District Attorney's Office. Defendant contends Major Vigil was not appropriately cross-deputized.

Defendant in his Supplemental Brief [Docket No. 58, pp. 9-14] sets out a thorough and helpful recitation of all available law enforcement cooperation agreements filed with the Oklahoma Secretary of State that include reference to the Seminole Nation, as well as

unfiled agreements produced by the Government in this case. Additionally, Seminole Nation Deputy Attorney General Victory Holland testified as a representative of the Seminole Nation at the suppression hearing.

The most relevant document at issue here is a "Deputation Agreement" filed with the Oklahoma Secretary of State on January 23, 2006, purporting to be an agreement between the Bureau of Indian Affairs ("BIA") and the State of Oklahoma. *See* Docket No. 58, Ex. 4, pp. 1-9. The Deputation Agreement specifically provides that amendment to the terms of the Deputation Agreement may be made "only with the express agreement of all the parties signatory to this Agreement," and that additional parties may join the Agreement "once a fully executed Addendum has been signed and filed with the Oklahoma Secretary of State." *Id.*, p. 8, ¶ 10.[2] Although contained in the same paragraph, the two sentences appear to address separate requirements for amendment of the Agreement and for joining the Agreement. On August 4, 2006, the Seminole Nation, following a tribal resolution, and Seminole County of Oklahoma both filed Addendums with the Oklahoma Secretary of State. *See id.*, Ex. 5 pp. 1-4. The 22nd District Attorney's Office (where the events in this case are located) and the Seminole Nation submitted an Addendum on March 3, 2009 to the Oklahoma Secretary of State. Docket No. 58, Ex. 6. The Addendums simply state that each signatory "hereby joins the Deputation Agreement." *Id.*, Exs. 5-6. Defendant

---

[2] The full text of ¶ 10 states: "It is understood by the parties to this Agreement that additional agencies with law enforcement responsibilities may join as parties hereto, and that amendment may be made to the terms of this Agreement only with the express agreement of all the parties signatory to this Agreement. Additional parties may join this agreement once a fully executed Addendum has been signed and filed with the Oklahoma Secretary of State."

contends all three addendums were "ineffective" because there is no evidence or signature indicating that either the BIA or the State of Oklahoma participated in the inclusion of these Addendums, as required in ¶ 10 of the original Agreement.

On October 20, 2018, the Seminole Nation passed a Tribal Resolution authorizing the execution of a cross-deputization agreement with, *inter alia*, the Seminole County Sheriff's Office, the 22nd Judicial District Attorney's office, and the City of Wewoka. *See* Docket No. 58, Ex. 7. Additionally, the Government provided a "City Addendum" in which the City of Wewoka purportedly joined the Deputation Agreement as to the Seminole Nation of Oklahoma on October 29, 2018. *Id.*, Ex. 8. This Addendum contains no file stamp from the Oklahoma Secretary of State and the undersigned Magistrate Judge could find no record of this particular document on the Oklahoma Secretary of State website. None of the Addendums in the record, whether filed with the Secretary of State or not, contain changes to the terms to the original Deputation Agreement. Additionally, the Code of Law of the Seminole Nation contains a provision regarding Cross-Deputation which encourages officers of the Lighthorse Police Department to qualify for and receive a Special Law Enforcement Commission. Seminole Nation Code of Law § 24-1-112. Deputy AG Holland's testimony did not address this provision, other than to agree that individual cross-deputization would be ideal.

Defendant in essence asks the Court to find (i) that the BIA and the State of Oklahoma never approved the Seminole Nation's entry into the January 2006 Deputation agreement and (ii) that, even if the Seminole Nation properly joined it, the City of Wewoka

did not.  Although it appears from the plain language of the Deputation Agreement that the Seminole Nation is properly a party to the Agreement, *see* Docket No. 58, Ex. 4, p. 8 ("Additional parties may join this agreement once a fully executed Addendum has been signed and filed with the Oklahoma Secretary of State."), and that the City of Wewoka is not (by virtue of failing to file with the Oklahoma Secretary of State), the undersigned Magistrate Judge declines to make such finding explicitly, as jurisdiction is lacking here whether the City properly joined the Deputation Agreement or not.

At the suppression hearing, Deputy AG Holland testified that the Deputation Agreement provides for state law enforcement officers to obtain a Special Law Enforcement Commission ("SLEC") card, which is one type of individualized commission. She then directed the Court's attention to ¶ 10 ("Additional Parties"), which allowed other entities to enter an Addendum.  She testified that the 2018 Addendum in which the City of Wewoka and Seminole Nation purportedly entered, *see* Docket No. 58, Ex. 8, and the 2009 Addendum between the 22nd District Attorney's Office and the Seminole Nation, *id.*, Ex. 6, indicate a desire to be cross-deputized pursuant to the Cross Deputation Agreement. Deputy AG Holland also testified that the parties to all these documents have decided or agreed that their signatures represent an agreement to enter into a "blanket" cross-deputization agreement for all officers as to each organization pursuant to these Addendums.

Deputy AG Holland agreed with the Court that the Deputation Agreement largely applied to SLEC commissions, as well as other individual commissions, but asserted that

the Seminole Nation had decided to use ¶ 10 as a method to wedge in a provision for blanket cross-deputization. In response to questioning from the Court, she stated that non-SLEC commissions are determined by the Tribe, but the undersigned Magistrate Judge was unable to locate this provision in the Agreement and neither party has provided evidence supporting this assertion. She further agreed that each officer possessing a SLEC commission would be "ideal," but noted that the requirements can be difficult to meet. In light of this difficulty, it appears the Seminole Nation looked for a shortcut and adopted ¶ 10 as the delivery device. Deputy AG Holland testified that the Seminole Nation determined, pursuant to the Deputation Agreement, to declare all officers whose employing entity has joined the Deputation Agreement cross-deputized so that individual officers did not have to obtain an individual commission, SLEC or otherwise. The insinuation here appeared to be that individual commissions would be too difficult for some officers to achieve, and that this was the workaround. Additionally, she testified that the process to get approval of entirely new agreements for the tribes, including the Seminole Nation, is so cumbersome under the Joint State Relations Act that tribes have decided to use these Addendums to "streamline the process." Importantly, Deputy AG Holland agreed with the Court that there is no language in the Deputation Agreement that provides for "blanket cross-deputization," but that the Seminole Nation and relevant state and county entities had all agreed that ¶ 10 could substitute for that language because it was too burdensome to do so properly.

    The undersigned Magistrate Judge finds that neither the Deputation Agreement nor

the related Addendums contain provisions permitting "blanket cross-deputization" among City of Wewoka police officers or District 22 Task Force officers with regard to tribal members within the boundaries of the Seminole Nation, or vice versa.  Deputy AG Holland's testimony is that the Agreement and Addendums have been used as a proxy for blanket cross-deputization to circumvent potentially cumbersome requirements under laws requiring approval for new agreement from the BIA and other entities.  Such a workaround is not a valid substitute for complying with the Deputation Agreement as plainly written.

"'The Indian canon of construction requires that courts liberally construe treaties, agreements, statutes, and executive orders in the American Indians' favor.' . . . Any ambiguity in an agreement is to be resolved in the American Indians' favor." *Pickup v. Dist. Ct. of Nowata Cnty., Oklahoma*, 2023 WL 1394896, at *52 (N.D. Okla. Jan. 31, 2023) (citing *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985) and *Carpenter v. Shaw*, 280 U.S. 363, 367 (1930)).  While the text of the Deputation Agreement may, and likely does, contain provisions for both SLEC commissions and some other type of individual commission, *see* Docket No., 58, Ex. 4, pp. 2-4, ¶ 2(A)-(H), Deputy AG Holland was unable to point to any language in the Deputation Agreement, an Addendum, or any relevant statute, to support her position as to "blanket cross-deputations."  Furthermore, even following the canons of construction here, between Deputy AG Holland's testimony and the actual documentation, there are competing interests of expediency and sovereignty, as well as potentially competing interests between the Seminole Nation and its individual citizens, as to what constitutes "the American Indians' favor."  In the absence of express

language or documentation providing for a "blank cross-deputization," the undersigned Magistrate Judge finds such does not exist under the circumstances of this case. Accordingly, the undersigned Magistrate Judge finds that Major Vigil lacked jurisdiction to arrest Defendant as he was not cross-deputized.

The Government cites a Findings and Recommendation issued in this Court in *United States v. West*, Case No. CIV-22-70-RAW, asserting that the Court has previously found that deputies acting within the Seminole Nation were properly cross-deputized and acting within their jurisdiction pursuant to this same Deputation Agreement. That Report, however, was not adopted and made final, as the Government dismissed that case before that could occur. Furthermore, the Report itself makes no such finding as to jurisdiction. Rather, U.S. Magistrate Judge Robertson provided a summary of Deputy AG Holland's testimony during a suppression hearing in that case, and then concluded, "To the extent that the deputies believed in good faith that they were acting within their jurisdiction pursuant to the cross-deputization agreement, they were entitled to act to pursue Defendant who had committed several traffic violations in the deputies' presence, and ultimately, to arrest him." Case No. CIV-22-70-RAW, Docket No. 49, p. 8. It thus appears there is no support for a finding of jurisdiction in this case.

## II.    Good Faith Belief

"The [next] question at issue is whether these jurisdictional deficiencies require exclusion of the evidence . . . obtained during the course of his investigation." *United States v. Patterson*, 2021 WL 633022, at *3 (E.D. Okla. Feb. 18, 2021), *affirmed*, 2022

WL 17685602 (10th Cir. Dec. 15, 2022).  It is clear from Major Vigil's testimony, as well as District 22 Task Force Supervisory Agent Adam Good's, that Officers Vigil, Sego, and Perteet held a good faith belief that they had jurisdiction to detain, arrest, and question Defendant.

Defendant strongly urges the Court to find that if there is no jurisdiction then the evidence should be excluded and the good faith exception does not apply.  In support, he contends the officers here did not act in objective good faith because the City of Wewoka and/or the Seminole Nation taught Major Vigil incorrectly.  He asserts that, in this post-*McGirt*[3] world, it is clear both that the Seminole Nation has not been disestablished and Major Vigil has not been cross-deputized as a Seminole Lighthorse officer.  He urges exclusion, rather than application of the good faith exception, to achieve a deterrent effect on the policy of the department and to "make local governments and Indian Nations in Oklahoma get their act together regarding cross-deputation so that Indians on Indian land can have some comfort that state officers who assert jurisdiction really possess jurisdiction."  Docket No. 58, p. 18.

In general, "[a] warrantless arrest executed outside of the arresting officer's jurisdiction is analogous to a warrantless arrest without probable cause."  *Ross v. Neff*, 905 F.2d 1349, 1354 (10th Cir. 1990).  Until recently, the Tenth Circuit had not applied the good faith exception in the context of a warrantless arrest.  The Tenth Circuit previously

---

[3] *McGirt v. Oklahoma*, 591 U.S. _, 140 S. Ct. 2452 (2020).

stated that "*Leon's*[4] good-faith exception to the exclusionary rule generally applies only narrowly outside the context of a warrant." *United States v. Herrera*, 444 F.3d 1238, 1251 (10th Cir. 2006). Following *McGirt* and its progeny, however, the Tenth Circuit more recently stated:

> [W]e see no reason *not* to extend the good-faith exception to the warrantless arrest . . . where: (1) the police and prosecutorial practices were consistent with the state's traditional exercise of jurisdictional authority, thus providing an objectively reasonable basis to conclude that state officials reasonably believed that they acted within the boundaries of the law; (2) there was no clear legal precedent from the Supreme Court or the Tenth Circuit expressly contradicting the presumption of legitimacy of those practices; and (3) applying the good-faith exception does not undermine the deterrence principles underlying the exclusionary rule.

*United States v. Pemberton*, _ F.4th _, 2024 WL 902937, at *7 (10th Cir. Mar. 4, 2024) (emphasis added). "In the context of warrantless arrests, the Fourth Amendment requires only that the arresting officers have probable cause to believe that the person to be arrested has committed a crime[.]" *United States v. Green*, 178 F.3d 1099, 1107 (10th Cir. 1999). In 2012, the Tenth Circuit limited *Ross*, stating, "*Ross* travels no further than the unique factual circumstances that spawned it: that is, a warrantless arrest by state police on federal tribal land." *United States v. Jones*, 701 F.3d 1300, 1312 (10th Cir. 2012).

While this case appears to fall within the parameters of even the *Jones* limitation of *Ross*, the Tenth Circuit's *Pemberton* decision is instructive. The Tenth Circuit distinguishes *Pemberton* from *Ross* for two reasons, stating, "First, we have declined to read *Ross* to require us to presume that a Fourth Amendment violation occurred just

---

[4] *United States v. Leon*, 468 U.S. 897 (1984).

because one sovereign operated within the jurisdiction of another sovereign's territory." *Pemberton*, 2024 WL 902937, at *8 ("Even if *Ross* controlled, it does not compel the per se result Mr. Pemberton seeks."). Second, the Tenth Circuit cited *Oklahoma v. Castro-Huerta*, 597 U.S. 629 (2022) for the proposition that officers operating "without jurisdiction in Indian lands does not preclude the good-faith exception—much less require the exclusionary rule." *Pemberton*, 2024 WL 902937, at *9 (citing *Castro-Huerta*, 597 U.S. at 636 ("[A]s a matter of state sovereignty, a State has jurisdiction over all of its territory, including Indian country.")). In *Pemberton*, however, the Tenth Circuit was addressing a post-conviction appeal of a warrantless arrest for a murder that took place in Indian Country in 2004, and the Court was careful to note that *McGirt* and *Castro-Huerta* had not been pronounced at the time the officers arrested Mr. Pemberton in 2004. The Tenth Circuit found, in that situation, that "traditional notions of state sovereignty typically would validate the police practices here, and the police conduct did not deviate from a state's usual constitutional exercise of jurisdictional authority, an objectively reasonable basis exists to conclude that state officials acted with a good faith belief in the lawfulness of their conduct." *Pemberton*, 2024 WL 902937, at *9.[5] Here, "traditional notions of state sovereignty" *do not* validate the police practices, and the parties agree that, *apart from a valid cross-deputization*, Major Vigil lacked jurisdiction over Defendant. The undersigned Magistrate Judge is thus cognizant that while the *Pemberton* factors are helpful, the

---

[5] Additionally, this case was supported by the presence of exigent circumstances, which were clearly not present in this case.

applicable circumstances are markedly different between a pre-*McGirt* warrantless arrest of an Indian in Indian Country and a post-*McGirt* arrest of the same.

Nevertheless, excluding evidence "applies 'only when it result[s] in appreciable deterrence[.]'"  *United States v. Patterson*, 2022 WL 17685602, at \*7 (10th Cir. Dec. 15, 2022) (quoting *Leon*, 468 U.S. at 909 (quoting *United States v. Janis*, 428 U.S. 433, 454 (1976)).  Defendant contends that exclusion is the only remedy that will prompt all relevant entities to take the necessary and appropriate steps to ensure an officer has jurisdiction when he makes an arrest.  *See Leon*, 468 U.S. at 918 ("If exclusion of evidence obtained pursuant to a subsequently invalidated warrant is to have any deterrent effect, therefore, it must alter the behavior of individual law enforcement officers *or the policies of their departments*.") (emphasis added).  This argument is not without merit.  It does appear likely that all entities – City of Wewoka, District 22, Seminole County, and Seminole Nation – will persist in asserting that "blanket cross-deputization" exists for these officers absent instruction from the Court.

However, the undersigned Magistrate Judge is also mindful of the partially analogous Tenth Circuit opinion in *United States v. Johnson*, 408 F.3d 1313 (10th Cir. 2005), although hesitant to apply it too broadly.  There, the Tenth Circuit held that the good faith exception applies where an officer acts in good faith reliance on a statute that is later deemed unconstitutional.  *Id.* at 1222-1323 ("[W]hile an officer cannot claim to have acted in good-faith reliance upon a statute if its provisions are such that a reasonable officer should have known that the statute was unconstitutional, nothing in these statutes would

have given rise to that suspicion.").  Moreover, "*Leon's* focus on deterring police conduct requires that *Leon's* good-faith exception almost always applies only when there is a determination made by a third party upon which the officer reasonably relied to conduct the challenged seizure or search, such as the magistrate in *Leon,* the legislature in *Krull*[6] and in *Johnson*, and the court clerk in *Evans*.[7]  This third party judgment provides a neutral check on the officer's conduct."  *Herrera*, 444 F.3d at 1253.  "[O]ur good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 923 n.23.  Here, the third-party authorization appears to come from the Seminole Nation itself, although, as discussed above, there is no clear legal precedent on the issue of "blanket cross-deputization" as relates to the Seminole Nation and this specific Deputation Agreement.  Accordingly, while the undersigned Magistrate Judge finds the deterrent properties of exclusion to be important, it appears that not only did the officers and their employing entities interpret the legal authority provided to them as providing jurisdiction, this policy was apparently made pursuant to the legal advice and cooperation of the Seminole Nation, which has an interest in protecting the rights of its members and is clearly a third party in relation to the relevant state entities.

Even though language authorizing a "blanket cross-deputization" is not found in the Deputation Agreement nor any of the subsequent documents filed with the Oklahoma

---

[6] *Illinois v. Krull*, 480 U.S. 340 (1987).
[7] *Arizona v. Evans*, 514 U.S. 1 (1995).

Secretary of State, given the positions of the state entities in conjunction with the cooperation from the Seminole Nation, the undersigned Magistrate Judge therefore finds Officers Vigil, Sego, and Good had an objectively reasonable interpretation of their jurisdiction as to Defendant. *Cf. Herrera*, 444 F.3d at 1254 ("Because the search in *Johnson* was premised on the officers' objectively reasonable interpretation of the relevant statutes authorizing the search, it would follow that the party subject to the search, also interpreting that statutory scheme in the same objectively reasonable manner, should have foreseen that that regulatory statute would subject him to such a warrantless administrative search."); *Johnson*, 408 F.3d at 1323 ("In sum, the officers relied in good faith on the administrative inspection statutes, as interpreted in Oklahoma cases, and on their objectively reasonable applicability to the inspection conducted at Autoplex Salvage."). Thus, Major Vigil possessed a reasonable good faith belief that his conduct was lawful in stopping, detaining, and arresting Defendant, even in the face of Defendant's assertion of tribal status. *See Davis v. United States*, 564 U.S. 229, 238 (2011) ("[W]hen the police act with an objectively reasonable good-faith belief that their conduct is lawful . . . the deterrence rationale loses much of its force, and exclusion cannot pay its way[.]").

The undersigned Magistrate Judge notes, however, that this objective good faith belief will not suffice indefinitely into the future. Should the District Judge adopt and affirm this decision, all entities involved will be placed on notice that "blanket cross-deputization" does not apply to the Seminole Nation nor any other signatory to the 2006 Deputation Agreement submitted in this case. Accordingly, moving forward, jurisdiction

18

will remain lacking and the good faith exception shall not apply where officers acting under the 2006 Deputation Agreement continue to assert their jurisdiction pursuant to a "blanket cross-deputization."

### III.    Traffic Stop

Although Defendant does not appear to challenge the traffic stop itself,[8] it is important to address it in the context of the events that followed.   The undersigned Magistrate Judge thus first finds that the traffic stop was justified at its inception.  "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."  *Whren v. United States*, 517 U.S. 806, 810 (1996).  "A traffic stop, however brief, constitutes a seizure within the meaning of the Fourth Amendment, and is therefore only constitutional if it is 'reasonable.'"  *United States v. Callarman*, 273 F.3d 1284, 1286 (10th Cir. 2001) (*quoting Delaware v. Prouse,* 440 U.S. 648, 653 (1979)).   Here, Major's Vigil's decision to stop Defendant's vehicle was justified at the inception because Major Vigil confirmed Defendant had a suspended driver's license before pulling him over.  *See* Okla. Stat. Tit. 47 § 6-303 (driving without a valid license is a misdemeanor punishable by a fine or imprisonment for up to one year).[9]  Additionally, Major Vigil's uncontested testimony is

---

[8] As the parties devoted much of their time to the weighty question of jurisdiction and cross-deputization, neither party devoted much time to assessing the traffic stop itself, leaving the undersigned Magistrate Judge to parse the arguments here.

[9] In the event an officer had been properly cross-deputized, it is notable that the Seminole Nation has incorporated all Oklahoma traffic and state violations.  *See* Seminole Nation Criminal Offenses and Traffic Offenses Tit. 6, §§ 174, 208.

that Defendant was not wearing a seatbelt.  This was sufficient to justify a traffic stop. *United States v. Whitley*, 680 F.3d 1227, 1232 (10th Cir. 2012) ("[W]e often state that a traffic stop is justified at its inception if an officer has . . . reasonable articulable suspicion that a particular motorist has violated any of the traffic or equipment regulations of the jurisdiction[.]") [quotation marks and citation omitted]; *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995) ("A police officer may arrest a person without a warrant if he [or she] has probable cause to believe that person committed a crime.").

    Search of Defendant.  Major Vigil testified that as soon as Defendant pulled over, he approached the driver's side of the vehicle and, weapon drawn, immediately ordered him out of the vehicle.  Defendant complied after a few seconds and stepped out of the vehicle, at which time Major Vigil placed him under arrest for driving with a suspended license and not wearing a seatbelt.  Before Officer Sego arrived, Major Vigil performed a pat-down search of Defendant.  This was of course permissible, as "[t]he Supreme Court has long held that 'in the case of a lawful custodial arrest a *full search of the person* is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment.'" *United States v. Lasley*, 412 Fed. Appx. 177, 180 (10th Cir. 2011) (quoting *United States v. Robinson,* 414 U.S. 218, 235 (1973) (emphasis added)).  Additionally, "the permissible scope of a search incident to arrest is not necessarily defined by the existence or absence of evidence of the particular crime for which the arrest is made." *Id.*  Major Vigil therefore had the authority to conduct a full search of Defendant, including his pockets, even though there would be no evidence of the

20

crime of driving with a suspended license.  *See Robinson*, 414 U.S. at 226 ("'When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.'") (quoting *Chimel v. California*, 395 U.S. 752, 762-763 (1969)).  However, even if Major Vigil informed Defendant that he was under arrest only after conducting the search of his person, he would have had a legitimate basis for doing so.  *United States v. Mitchell*, 2017 WL 552732, at *9 (D. Kan. Feb. 10, 2017) ("In the Tenth Circuit, a warrantless search preceding an arrest is still 'a legitimate search incident to arrest as long as (1) a legitimate basis for the arrest existed before the search, and (2) the arrest followed shortly after the search.'") (quoting *United States v. McKissick*, 204 F.3d 1282, 1296 (10th Cir. 2000) (quoting *United States v. Anchondo*, 156 F.3d 1043, 1045 (10th Cir. 1998)); *see also United States v. Sanchez*, 555 F.3d 910, 921 (10th Cir. 2009) ("[F]or search-incident-to-arrest purposes we may deem the arrest to have occurred before the formal announcement to a suspect that he is under arrest. To be sure, it appears that there can be no search incident to arrest unless the suspect is at some point formally placed under arrest.").  Because the undersigned Magistrate Judge is satisfied that Major Vigil had probable cause to arrest Defendant prior to searching his person, he was therefore justified in conducting a full, warrantless search of his person incident to the arrest.  Consequently,

the statements Defendant made after his arrest "were not the result of an illegal search leading to his arrest and need not have been suppressed as the 'fruit of the poisonous tree[,]'" *McKissick*, 204 F.3d at 1297, nor the evidence found on his person.

    <u>Search of Defendant's Vehicle Incident to Arrest</u>.  The next issue is whether Major Vigil was authorized to search Defendant's vehicle.  In 2009, "the Supreme Court held that police are authorized to search a vehicle incident to a recent occupant's arrest in two instances: (1) when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search; and (2) 'when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" *Mitchell*, 2017 WL 552732, at *9 (quoting *Arizona v. Gant*, 555 U.S. 332, 343 (2009)).  Here, Major Vigil's search is not authorized by the first prong, as Officer Sego arrived and handcuffed Defendant prior to the search of the vehicle.  Moreover, the body cam footage does not support his argument that he observed the handgun at the same time as he retrieved the can from the vehicle.  Additionally, the second prong does not apply here because, as stated above, evidence of driving with a suspended license would not be found on Defendant's person.  Accordingly, Major Vigil was not authorized to search Defendant's vehicle incident to the arrest.

    <u>Automobile Exception to the Warrant Requirement</u>.  "[I]t is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Ross,* 456 U.S. 798, 825 (1982) (quoting *Katz v. United States,* 389 U.S. 347, 357 (1967)).  "Law

enforcement officers may conduct a warrantless search of an automobile if they have probable cause to believe that it contains evidence of a crime or contraband.'" *United States v. Frazier*, 429 Fed. Appx. 730, 733 (10th Cir. 2011) (citing *United States v. Burgess*, 576 F.3d 1078, 1087 (10th Cir. 2009)).  Under the automobile exception, "officers may search an automobile without having obtained a warrant so long as they have probable cause to do so."  *Collins v. Virginia*, 584 U.S. 586, 592 (2018) (this is based on the ready mobility of vehicles, as well as the pervasive regulation of vehicles capable of traveling on the highway); *see also California v. Acevedo*, 500 U.S. 565, 580 (1991) (same).

In this case, the right to arrest Defendant did not automatically provide the right to search Defendant's vehicle as there was no reason to believe the vehicle would contain evidence of the crime of arrest*, i.e.*, driving with a suspended license; rather, it arose following the search of Defendant's person incident to arrest, which revealed the glass pipe.  *United States v. Lopez*, 777 F.2d 543, 550 (10th Cir. 1985) ("The probable cause requirement is satisfied when the officers conducting the search have 'reasonable or probable cause' to believe that they will find the instrumentality of a crime or evidence pertaining to a crime before they begin their warrantless search.") (quoting *United States v. Matthews*, 615 F.2d 1279, 1287 (10th Cir. 1980)); *see also Chambers v. Maroney*, 399 U.S. 42, 52 (1970) ("For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment."); *Maryland v.*

*Dyson*, 527 U.S. 465, 467 (1999) ("[I]n cases where there was probable cause to search a vehicle 'a search is not unreasonable if based on facts that would justify the issuance of a warrant, *even though a warrant has not been actually obtained.*'") (quoting *Ross*, 456 U.S. at 809 (emphasis in *Dyson*)).  The discovery of the glass pipe on Defendant's person demonstrated the presence of drug paraphernalia, making it reasonable for Major Vigil to believe that evidence relevant to possession of a controlled substance crime might be in the vehicle.  *See United States v. Forbes*, 528 F.3d 1273, 1277-1278 (10th Cir. 2008) ("[T]he Fourth Amendment unquestionably prohibits the search of a vehicle's interior unless law enforcement officials receive consent, have a warrant, or otherwise establish probable cause to support the search.").  *See, e.g.*, *United States v. Davis*, 569 F.3d 813, 816-818 (8th Cir. 2009) (concluding law enforcement officer's warrantless search of defendant's vehicle fell within the search incident to arrest exception where, at the time of the search, the officer had already discovered marijuana in the defendant's pocket and placed defendant in custody); *see also Mitchell*, 2017 WL 552732, at *9 ("While conducting the search incident to arrest, Officer Fisher discovered synthetic marijuana and methamphetamine, at which point Mitchell was arrested for both reckless driving and possession of a controlled substance. Clearly, Officer Fisher had no reason to believe he would find evidence of reckless driving in Mitchell's vehicle, but it was reasonable to believe evidence relevant to the possession of a controlled substance crime might be found in the vehicle. Thus, Officer Fisher had 'a basis for searching the passenger compartment of [Mitchell's] vehicle and any containers therein.'") (quoting *Gant*, 556 U.S. at 344).  *Cf.*

*Gant*, 556 U.S. at 344 ("Gant was arrested for driving with a suspended license—an offense for which police could not expect to find evidence in the passenger compartment of Gant's car. Because police could not reasonably have believed either that Gant could have accessed his car at the time of the search or that evidence of the offense for which he was arrested might have been found therein, the search in this case was unreasonable."); *United States v. Madden*, 682 F.3d 920, 926 (10th Cir. 2012) (Not a valid search incident to arrest where Defendant "was seated in the back of Officer Balderrama's patrol car at the time of the search and it was not reasonable to believe his vehicle contained evidence of the offense of arrest, *i.e.*, evidence of two outstanding municipal misdemeanor traffic warrants.") (citing, *inter alia*, *Gant,* 556 U.S. at 343-344, 351).

"Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *United States v. Bradford*, 423 F.3d 1149, 1159 (10th Cir. 2005) (quotation omitted). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Ross*, 456 U.S. at 824; *see also United States v. Arzaga*, 9 F.3d 91, 94 (10th Cir. 1993) ("It is well established that a warrantless search of an automobile based on probable cause does not violate the Fourth Amendment.") (citing *Carroll v. United States*, 267 U.S. 132 (1925) and *Acevedo*, 500 U.S. at 579-580). "Probable cause is measured against an objective standard[, although] an officer may draw inferences based on his own experience." *United States v. Jurado-Vallejo*, 380 F.3d 1235, 1238 (10th Cir. 2004).

25

The totality of the circumstances here support probable cause for Major Vigil's search.  Most importantly, the glass pipe was found on Defendant's person, making it likely that drugs would be found in the vehicle.  Additionally, Defendant had an open container of alcohol when Major Vigil stopped the vehicle, and Officer Sego's body cam footage shows some support that Defendant may have been impaired and likewise records Major Vigil asking Defendant about substance abuse that he might have engaged in prior to the arrest.  *See* Govt. Hr'g Ex. 4, Video 10:15:35.  Less persuasive but also of note is Major Vigil's testimony that, while he was following Defendant prior to the traffic stop, Defendant appeared to be making furtive movements around the middle of his vehicle and that he swerved once.  Defendant challenges this testimony, asserting the tint of the back window was too dark for this to be seen, but admits that this portion of the encounter is not recorded on audio or video.  Despite Defendant's objection to Major Vigil's testimony on this point, the undersigned Magistrate Judge finds under the totality of the circumstances that there was probable cause to believe Defendant's vehicle contained evidence of a crime or contraband. *See United States v. Aranda-Diaz*, 2013 WL 4446801, at 31 (D. N.M. July 15, 2013) ("With probable cause to believe that the Suburban contained evidence relevant to the heroin distribution crime, [*Ross*] and [*Gant*] provided the officers the lawful ability to search any area of the vehicle in which evidence relevant to the crime might be found."); *see also United States v. Stephenson*, 452 F.3d 1173, 1177 (10th Cir. 2006) ("Probable cause to search a vehicle exists if, under the totality of the circumstances, a fair probability exists that the vehicle contains contraband or other evidence which is subject to seizure

under the law.").   Accordingly, the undersigned Magistrate Judge finds that the evidence obtained through the search of Defendant's vehicle should not be suppressed.

## Conclusion

In summary, the undersigned Magistrate Judge PROPOSES the findings set forth above and RECOMMENDS that all portions of Defendant's Opposed Motion to Suppress Evidence and Request for Hearing [Docket No. 40] be DENIED by the Court, with the exception of the request for hearing which was previously granted and a suppression hearing held on February 23, 2024 [Docket No. 54].   Any objections to this Report and Recommendation must be filed within fourteen (14) days.

IT IS SO ORDERED this 18th day of March, 2024.

_____
**GERALD L. JACKSON**
**UNITED STATES MAGISTRATE JUDGE**